**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | | |
|---|---|---|---|
| **DÉJÀ VU OF NASHVILLE, INC. and** | ) | | |
| **THE PARKING GUYS, INC.** | ) | | |
| | ) | | |
| **Plaintiffs,** | ) | **Case No. _____** | |
| **Vs.** | ) | | |
| | ) | **Jury Demand** | |
| **METROPOLITAN GOVERNMENT** | ) | | |
| **OF NASHVILLE AND DAVIDSON** | ) | | |
| **COUNTY, acting by and through its** | ) | | |
| **TRAFFIC AND PARKING** | ) | | |
| **COMMISSION, FREDDIE** | ) | | |
| **O'CONNELL, individually, LEE** | ) | | |
| **MOLETTE, individually, and LINDA** | ) | | |
| **SCHIPANI, individually.** | ) | | |
| | ) | | |
| **Defendants.** | ) | | |

---

**COMPLAINT**
_____

Come now the Plaintiffs Deja Vu of Nashville, Inc. and The Parking Guys, Inc., by and through undersigned counsel, Bob Lynch, Jr., and hereby file their complaint as follows:

### I.   INTRODUCTION:

This is a civil action wherein Plaintiffs pray for a declaratory judgment, money damages, attorney fees and costs to remedy Defendants' actions under color of state law to deprive the Plaintiffs of their rights, privileges and immunities secured to them by the Constitution of the United States.  The Defendants engaged in civil conspiracy to deny The Parking Guys a Valet Parking Permit to service Deja Vu and to otherwise impede patron access to Deja Vu's establishment.

### II.   PARTIES, VENUE, AND JURISDICTION:

1

1. Plaintiff Deja Vu of Nashville, Inc. (hereinafter "Deja Vu") is a corporation licensed to do business in the state of Tennessee. Its registered agent is CT Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, TN 37929-9710 and the principal address is 1418 Church Street, Nashville, Tennessee, 37203.

2. Deja Vu is engaged in the presentation of female performance dance entertainment to the consenting adult public. Such are protected speech and expression under the First and Fourteenth Amendments of the United States Constitution.

3. Plaintiff The Parking Guys, Inc. (hereinafter "The Parking Guys") is a corporation licensed to do business in the state of Tennessee. Its registered agent is Mr. Craig Martin (hereinafter "Mr. Martin") and the principal address is 124 Hedgelawn Drive, Hendersonville, TN 37075. At all times material and relevant herein, Mr. Martin was and is the President and CEO of The Parking Guys.

4. The Defendant Metropolitan Government of Nashville and Davidson County (hereinafter "Metro") and its Traffic and Parking Commission (the "Commission") is a municipality created and authorized pursuant to statute by the State of Tennessee.

5. Defendant Freddie O'Connell (hereinafter "O'Connell") is an adult resident of the State of Tennessee who resides in the Middle District of Tennessee. O'Connell is a District 19 Council Member for Metro. Mr. O'Connell is sued in his individual capacity for his involvement in a civil conspiracy to violate Plaintiffs' constitutional rights under the First and Fourteenth Amendments to the United States Constitution.

6. Defendant Lee Molette (hereinafter "Molette") is an adult resident of the State of Tennessee who resides in the Middle District of Tennessee. Molette is sued in his individual

2

capacity for his involvement in a civil conspiracy to violate Plaintiffs' constitutional rights under the First and Fourteenth Amendments to the United States Constitution.

7.     Defendant Linda Schipani (hereinafter "Schipani") is an adult resident of the State of Tennessee who resides in the Middle District of Tennessee.  Schipani is sued in her individual capacity for her involvement in a civil conspiracy to violate Plaintiffs' constitutional rights under the First and Fourteenth Amendments to the United States Constitution.

### III.     JURISDICTION AND VENUE:

8.     Jurisdiction is conferred on this Court for the resolution of the substantial constitutional questions presented here by virtue of 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 28 U.S.C. § 1343(a)(3), the latter of which provides, in pertinent part, that the district courts shall have original jurisdiction over any civil action authorized by law to be commenced by any person:

> "To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States. . . ."

9.     The statutory law which further authorizes the institution of this suit, and in particular the damage claims asserted herein, is 42 U.S.C. § 1983, which provides, in part, as follows:

> "Every person who, under color of any statute, ordinance, regulation, custom or usage, or any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

10.     The prayer for declaratory relief is founded on Rule 57 of the Federal Rules of Civil Procedure as well as 28 U.S.C. § 2201, the latter of which provides that:

3

"... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. . . ."

11. Federal question jurisdiction for the request for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

12. This suit is authorized by law to redress deprivations under color of state law of rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution, and for declaratory and injunctive relief.

IV. **RELEVANT ORDINANCE PROVISIONS:**

13. A true and accurate copy of Chapter 12.41 of the Code of the Metropolitan Government of Nashville and Davidson County, Tennessee (the "Metro Code" or "MC"), entitled "Valet Services" is attached hereto as Exhibit 1.

14. The Metro Code provisions for Valet Services defines a "License" as "the license issued by the department of public works allowing a person to engaged [sic] in the business of valet parking within the area of the metropolitan government." MC § 12.41.010.

15. A "Permit" or "valet parking permit" is "the permit issued by the department of public works allowing a valet parking operator to conduct a valet service at a specified location or locations." MC § 12.41.010.

16. Valet parking," "valet parking operation," "valet operation," or "valet service" all mean "the process by which patron's vehicles are removed from designated spaces on the public street to private parking areas for storage and subsequent retrieval upon patron's demand." MC § 12.41.010.

4

17.     Thus, a commercial valet operator must be generally licensed by Metro, and must also obtain a permit to conduct a valet at a specific location. There is no dispute that The Parking Guys are duly licensed to generally conduct valet operations.

18.     Metro Code § 12.41.030, "Valet location permit required," states:

> In addition to the licensing requirements of Section 12.41.020 of this chapter, the department **shall issue** parking permits to valet parking operators to conduct their operations on public streets as a commercial enterprise or in furtherance of a commercial enterprise. A separate permit is required for each location where valet parking services are provided. Permits **will be issued** only for locations where valet parking would not be detrimental to the public safety, health and welfare of the inhabitants of Nashville and Davidson County and only after approval of the commission.
>
> (Emphasis added).

19.     Metro Code § 12.41.040 provides that a permit "may be cancelled by the commission" if the "commission determines that the valet operation is creating a hazardous traffic condition and/or serious disruption to the traffic flow or is otherwise inimical to the public health, safety, or welfare."

## V.     COMMON ALLEGATIONS:

20.     On or about February 8, 2016 (updated February 9, 2016), The Tennessean reported that Deja Vu Showgirls Nashville was selling its long-time location of 26 years at 1214 Demonbreun Street to Nashville developers, who agreed to assist Deja Vu in finding another location within 18 months in Nashville, Davidson County. Metro's Chief Operating Officer, Rich Riebeling, highly praised the deal by stating, "[i]t's a great location and it has a lot of possibilities." (Attached hereto as Exhibit 2 and incorporated by reference as though fully set forth herein is a true and accurate copy of the February 8, 2016 Tennessean online article, "*Sale of Nashville Déjà Vu site to open up downtown's front door*").

5

21.     On or About March 29, 2016, the Nashville Business Journal published a headline story announcing that Deja Vu was interested in a building located at 1418 Church Street for its new location, which is located in an adult use zone. (Attached hereto as Exhibit 3 and incorporated by reference as though fully set forth herein is a true and accurate copy of said online article entitled, "*Déjà Vu strip club, among others, scouting Church Street building*").

22.     On or about July of 2016, Deja Vu's landlord entered into a purchase agreement for the 1418 Church Street property.

23.     On or about August 2, 2016, O'Connell and Bob Mendes (Metro Council members) introduced Ordinance No. BL2016-350 (hereinafter the "Ordinance"), with the intended effect of eliminating Deja Vu's prospective location for its new gentleman's club at 1418 Church Street or any other meaningful location in Nashville. (Attached hereto as Exhibit 4 and incorporated by reference as though fully set forth herein is a true and accurate copy of said ordinance).

24.     On August 10, 2016, The Tennessean reported that Deja Vu had paid $3 million for the adult use zoned property located at 1418 Church Street. Despite Deja Vu's reliance on the adult use zone at that location, Mr. O'Connell publicly made it clear that the purpose of the zoning bill was to block Deja Vu from operating its club at that location. (Attached hereto as Exhibit 5 and incorporated by reference as though fully set forth herein is a true and accurate copy of the August 10, 2016 Tennessean online article, "*Deja Vu strip club pays $3M for Church Street property*").

25.     In order to protect its First Amendment rights to operate its gentleman's club, Deja Vu was required to expend s substantial amount of money to hire legal representation and public relations professionals. These efforts to protect its First Amendment rights are summarized in a September 20, 2016 cease-and-desist letter sent to Metro by undersigned counsel to combat the ordinance moving forward in the City Council and Planning Commission (hereinafter "Planning

6

Commission"). (Attached hereto as <u>Exhibit 6</u> and incorporated by reference as though fully set forth herein is a true and accurate copy of said letter).

26.     After Metro received the September 20, 2016 letter, the ordinance was deferred by Metro in the Planning Commission, but it was scheduled for a second reading and public hearing in front of the City Council on October 4, 2016. Again, Deja Vu presented additional information in a letter to Metro dated September 27, 2016, to contest the ordinance. (Attached hereto as <u>Exhibit 7</u> and incorporated by reference as though fully set forth herein is a true and accurate copy of said letter).

27.     During the October 4, 2016 public hearing in front of Metro City Council, Mr. O'Connell publicly withdrew the ordinance and Metro's threat to the existence of Deja Vu in Nashville was temporarily removed.

28.     On May 10, 2017, Metro's Sexually Oriented Business License Board approved the license for the operation of Deja Vu's new club located at 1418 Church Street.

29.     Since being granted a license to operate by Metro's Sexually Oriented Business License Board, which strictly regulates Deja Vu for any prohibited activity, Deja Vu has not been issued any violations regarding its operation at 1418 Church Street.

30.     On June 7, 2017, The Tennessean reported that Mr. Lee Molette (Midtown businessman) and Mr. O'Connell (Metro Councilman) made the following statements about the new Deja Vu location as follows:

> Midtown businessman Lee Molette cites some patrons of the strip club using drugs, dropping liquor bottles and other litter and parking illegally on his and other properties as among key problems since Déjà Vu's soft opening at 1418 Church St. two weeks ago.
>
> "It's a mess," said Molette, who last year fought against the strip club's planned move to that area. "It's what we were afraid of. It's a nuisance and that's now. Just think about after they close the other club down and everybody's coming over here."

7

….

Molette said a video camera on an adjacent building captured girls "mooning" people from Deja Vu's rooftop. "They're mooning on Church," Molette said. "They're not just dancing on Church."

In addition, Metro Councilman Freddie O'Connell said he's seen a video footage of a drug deal on a neighboring property. "We've raised a number of issues with the zoning administrator, and based on what his determination is, we'll see if we can coerce Deja Vu into being the good neighbor they say they want to be."

(Attached hereto as <u>Exhibit 8</u> and incorporated by reference as though fully set forth herein is a true and accurate copy of the June 7, 2017 Tennessean online article, "*New Deja Vu strip club on Church Street quickly draws complaints*").

31.     The same online article reported that Metro Police were increasing patrols to verify the complaints. Deja Vu has requested any and all police verification of such alleged conduct, but none have been provided.

32.     The statements made by Mr. Molette and Mr. O'Connell are false and malicious and were done so with the intent to have Deja Vu declared a nuisance and thus under Tennessee law, have it potentially closed.

33.     In the meantime, Deja Vu entered into a written agreement with The Parking Guys to provide valet services for the club.  The Parking Guys were chosen by Deja Vu, in part, because it has been in the valet business for 15 years without any sanctions from the Metro Traffic and Parking Commission.

34.     A properly run valet service would and has contributed to the orderly flow of traffic adjacent to Deja Vu's 1418 Church Street location, and is necessary to attract high end patrons and clientele, the absence of which deprives both Plaintiffs of income.

35.     Or on about May 25, 2017, The Parking Guys applied to Metro's Public Works Department for permission to operate a valet service on 15th Avenue North to service Deja Vu's

8

1418 Church Street. However, the request was denied for the stated reason that parking is not allowed on Church Street or 14th Avenue in Nashville. (Attached hereto as Exhibit 9 and incorporated by reference as though fully set forth herein is a true and accurate copy of the Service Request Report).

36. The stated reason in the Service Request Report for denial of the request was pretextual and untrue. The map displayed on page 2 of the Service Request Report (Exhibit 10) show the actual location for the request on 15th Avenue North.

37. Thereafter, on or about June 7, 2017, Diane Marshall of Metro Public Works orally informed Mr. Martin (The Parking Guys) that his service request was denied. This was the first instance Mr. Martin learned of action on the request and when he asked why it was being denied, Ms. Marshall did not give him a reason.

38. On or about June 8, 2017, Mr. Martin (The Parking Guys) timely and properly filed an 'appeal' of the denial of the valet application. (Attached hereto as Exhibit 11 and incorporated by reference as though fully set forth herein is a true and accurate copy of the "appeal").

39. Because Metro Code § 12.41.030 provides that a valet location permit may only be issued "after approval of the commission" the character of Public Works June 2, 2017 denial is not clear. However, it is clear that Metro Public Works issuance of a valet location permit or valet parking permit (*compare* Metro Code § 12.41.010 *with* Metro Code § 12.41.030 regarding "location permit" vs. "parking permit," hereinafter simply a "valet permit") upon approval by the commission at a public meeting would be a valid permit under the Valet Services ordinance.

40. Prior to and at the meeting Schipani and Monette engaged in a plan to provide the Commission with false information to obtain a denial of the application or appeal for a valet permit.

41. On or about June 9, 2017, Schipani (cralms@aol.com) emailed Diane Marshall

9

(Public Works) with a copy to Molette (lmolette@gmail.com) stating, "[a]nything that you can do to support the denial of this valet parking will be appreciated" and attached a June 9, 2017 correspondence on letterhead for the "Midtown Church Street Business & Residential Association." (Attached hereto as Exhibit 12 and incorporated by reference as though fully set forth herein is a true and accurate copy of said email with attachment).

42. The June 9, 2017 Midtown Church Street Business & Residential Association (Exhibit 12) contains numerous false statements, that were knowingly false when made or that were made with reckless disregard to the truth, and that were communicated to obtain a denial of the valet permit sought by the Parking Guys. These knowingly false statements include but are not limited to statements to the effect that:

    a. Members of the Association have witnessed near miss accidents and traffic congestion caused by valet;

    b. Police had deemed the operation of the valet service to be hazardous;

    c. There is not adequate space for operation of a valet service; and

    d. The location of the valet on 15th Avenue North creates a hazard for North turns off of Church Street.

43. Beginning on or about June 14, 2017, the Parking Guys, via Martin, began applying for and receiving a series of "Lane Closure Permits" for the operation of a valet on 15th Street North servicing 1418 Church Street during the pendency of the valet permit 'appeal.' Attached hereto as Exhibit 13 are true and accurate copies of Land Closure Permit applications, Permit Payment Summary, and Permits.

44. On or about July 7, 2017, Schipani emailed Chip Knauf and Diane Marshall of Metro Public Works, and Lee Molette, a correspondence and a series of photographs. Attached hereto as

10

Exhibit 14 and incorporated by reference as though fully set forth herein is a true and accurate copy of said email correspondence and photographs.

45.     The email correspondence and photographs Exhibit 14 email contained knowingly false statements and was designed to create a knowingly false impressions including but not limited to:

     a.  The that "Midtown Church Street Business and Residential Association" has had "consistent problems with valet parking on both sides of the stree which impedes the flow of traffic, blocking private parking, and presenting safety issues for drivers plus pedestrians."

     b.  There is no area available for two parking spaces for the valet operation.

     c.  That the photographs demonstrated traffic problems or safety issues related to the operation of a valet parking operation.

46.     The 'appeal' of the valet permit denial was placed on the Commission's July 10, 2017 agenda meeting. (Attached hereto as Exhibit 15 and incorporated by reference as though fully set forth herein is a true and accurate copy of said agenda).

47.     Attached hereto as Exhibit 16 and incorporated by reference as though fully set forth herein is a true and accurate copy of the Minutes of the Meeting of the Traffic and Parking Commission of July 10, 2017).

48.     A true and accurate transcript of the relevant portions of the Commission's July 10, 2017 hearing is attached hereto as Exhibit 17 and incorporated by reference as though fully set forth herein.

11

49.     At the Commission's July 10, 2017 Hearing, Molette presented testimony in opposition to the Parking Guys being granted a Valet Permit.  Molette's testimony included knowingly false statement, including but not limited to the effect that:

   a.  The street it too narrow for a valet operation;

   b.  The operation of a valet service was causing congestion;

   c.  The operation of a valet service was causing traffic to back up on 15th Street to Church Street.

   d.  The congestion caused by the operation of the Valet Service is "day in and day out."

   e.  That a pedestrian was stuck by a vehicle as a result of the valet operation.

50.     At the Commission's July 10, 2017 Hearing, Schipani presented testimony in opposition to the Parking Guys being granted a Valet Permit.  Schipani's testimony included knowingly false statements that were known to be false when made or that were made with reckless disregard to the truth, including but not limited to the effect that:

   a.  The valet operation was parking vehicles on her property

   b.  The valet operation is causing "traffic up and down the street."

   c.  The valet operation is "constantly" parking in a manner that impedes vehicular ingress and egress to her business's parking lot.

51.     At the Commission's July 10, 2017 Hearing, Martin testified that the allegation against the Parking Guy's valet operations at 1418 Church Street were false.  Martin explained that the majority of their activity is between 10:00 pm and 2:00 am, and that more traffic is generated by nearby businesses Tribe and Play, who have valet operations serving the business directly from Church Street.

52.     At the Commission's July 10, 2017 Hearing, Diane Marshall of Metro Public works testified that the requested valet permit met technical requirements of the Metro Code. She explained that the "No Parking to Corner" sign could be properly moved from 90 feet to 30 feet from the corner, thereby opening up 60 feet for three 20-foot valet lanes.

53.     Chip Knauf, Traffic Engineer for Metro Public Works further testified that he requested valet permit met the technical requirements of the code, including:

> Okay, I'm going to go back to the technical versus the testimony. Technically, if you've got 30 feet or more you can allow valet parking on the street because you've got the width for passers-by – if everybody is going right. If your parking outside of that 30 feet Diane's referring to, if your parking in a  -- if you're valeting in a – in a legal parking area, and if you've met the requirements for insurance and off-street storage and all that, those technical components have been meet.
>
> *     *     *
>
> That's what we're talking about here, We – they – ***technically all the requirements have been met***. Operationally, do we have evidence that it is – is or isn't working the way it's supposed to? There's a few photos floating around now. There have been an email or two of some photos.
>
> And if we can get our hands on a video, I've hear somebody mention, maybe that would help make a decision. But right now they – it meets the technical requirements. Operationally we don't – I don't have enough info.
>
> (Exhibit 17, emphasis added).

54.     At the conclusion of the Commission's July 10, 2017 Hearing, the matter was deferred to the next meeting to gather additional evidence, including a video claiming to show traffic concerns related to the valet operation servicing Deja Vu.

55.     Videographic evidence of traffic concerns caused by the valet operation was never produced by Schipani, Molette, or anyone else, and such evidence never actually existed.

56.     Following the Commission's July 10, 2017 Hearing, Metro retained Collier Engineering Company, Inc. (hereinafter "Collier") to perform a study of the ongoing valet operation on 15th Avenue North servicing Deja Vu.

13

57.     A true and accurate copy of Collier's report on the 15th Avenue North valet operation by the Parking Gus servicing Deja Vu (hereinafter the "Collier Report") is attached hereto as Exhibit 18.

58.     However, there is nothing in the Collier summary which is irregular, improper, or inappropriate and it did not provide any factual basis to deny the appeal, in fact, it supported the granting of the permit.

59.     The Collier Report summarized Collier's count of "valet maneuvers," a vehicle pick up and drop off each counting as 1 maneuver (such that a person dropping of and later retrieving their vehicle would total two maneuvers):

## Valet Maneuver Counts

| Time of Day (Hour Beginning) | Valet Maneuvers per Hour (by Day/Date) | | |
|---|---|---|---|
| | Thursday (7/27/2017) | Friday (7/28/2017) | Saturday (7/29/2017) |
| 6:00 PM | 3 | 2 | 4 |
| 7:00 PM | 6 | 3 | 4 |
| 8:00 PM | 2 | 5 | 5 |
| 9:00 PM | 5 | 4* | 4 |
| 10:00 PM | 1 | 4 | 4 |
| 11:00 PM | 3 | 7 | 3 |
| 12:00 AM (Next Day) | 5 | 4 | 1 |
| 1:00 AM | 3 | 7** | 4 |
| 2:00 AM | 4 | 5*** | 5 |
| 3:00 AM | 1 | 8 | 3 |
| Total | 33 | 49 | 37 |

* One (1) vehicle observed having to wait for on-coming traffic to clear before passing the valet stand.
** One (1) vehicle observed having to wait for on-coming traffic to clear before passing the valet stand.
*** Three (3) vehicles observed having to wait for on-coming traffic to clear before passing the valet stand.

14

60.     The Collier Report (Exhibit 18), contained the following narrative summary:

As shown in the table, approximately 49 valet maneuvers were counted on Friday, July 28th evening and Saturday July 29th early morning, which results in approximately 25 valeted vehicles, and was the busiest day observed. *It should be noted that rideshare, taxi, and pedicab drop-off and pick-up activities were also observed occurring along the 15th Avenue North block frontage*. The observations also showed that there were five (5) vehicles that experienced delay on 15th Avenue North due to congestion at the valet stand and curb face. One instance was observed during the 9:00 PM hour on Friday evening, one instance during the 1:00 AM hour of Saturday morning, and three vehicles were affected during the 2:00 AM hour on Saturday morning. When this occurred, the street operated with slow "Yield-Flow" conditions. During the observations, northbound traffic on 15th Avenue North *backed up into the crosswalk* at its intersection with Church Street on two occasions both during the 2:00 AM hour. ***One instance lasted approximately 10 seconds and the second lasted approximately 30 seconds. Both involved one vehicle turning onto 15th Avenue North from Church Street and did not extend beyond the crosswalk***. The busiest time period for the valet stand and rideshare/occurred around closing time (3:00 AM) on Friday evening/Saturday morning when through traffic on 15th Avenue North and Church Street is fairly low. Parking and standing was observed on the west side of 15th Avenue North within 20-30 feet of the stop line for southbound 15th Avenue North traffic at Church Street during portions of the observations. A couple of vehicles were observed making U-turns from the valet stand to go south on 15th Avenue North and access the traffic signal; however, it is not clear from the data whether those were made by valet staff or the customers/vehicle owners. The traffic signal goes into Flash Mode at 3:00 AM.

(Emphasis Added).

61.     Nevertheless, Schipani and Molette continued their plan of presenting knowingly false information to the Commission with the intent of damaging Deja Vu and the Parking Guys by way of a denial of the requested Valet Permit.

62.     On or about August 11, 2017, Schipani issued an email to Chip Knauf of Metro Public Works, copying Molette (Lee.fsdevelopers@gmail.com) and O'Connell (Council Member) requesting that the Commission deny the Parking Guys requested Valet Permit servicing Deja Vu.

(Attached hereto as Exhibit 19 and hereby incorporated by reference as though fully set forth herein, is a true and accurate copy of said email).

63.     Schipani's August 11, 2017 email (Exhibit 19) contains false statement that were known to her to be false when made or that were made with reckless disregard to the truth, including statements to the effect that:

a.   The neighborhood surrounding the valet permit operation "continues to witness public safety hazards" associated with the Parking Guys' valet operation servicing Deja Vu;

b.   The Parking Guys' valet operation servicing Deja Vu was somehow associated with "two pedestrians hit by cars in the past two months."

c.   "The corner of Church Street and 15th is gridlock most nights."

d.   That the claims gridlock at 15 Avenue North and Church Street was somehow associated with Parking Guys' valet operation servicing Deja Vu.

e.   That Parking Guys' valet operation servicing Deja Vu was a cause of traffic backing up from 15th Avenue north to Church Street "thus blocking the traffic light and no one can move . . . ."

f.   That photographs attached to the email demonstrate traffic of safety concerns caused by the Parking Guys' valet operation servicing Deja Vu

64.     On or about August 14, 2017, Freddie O'Connell issued an email to Chip Knauf of Metro Public Works urging denial of the Valet Permit requested by the Parking Guys. (Attached hereto as Exhibit 20 and hereby incorporated by reference as though fully set forth herein, is a true and accurate copy of said email).

16

65.     O'Connell's email (Exhibit 20) to Knauf was intended to be conveyed to the Commission and to influence the Commission to deny the Parking Guys' requested Valet Permit. O'Connell issued (Exhibit 20) the email with the intent to use the color of his office as Metro Council Member to influence the Commission to deny the permit.

66.     O'Connell's email (Exhibit 20) to Knauf contained statements of fact, couched as statements of opinions, that were knowingly false when made or that were made with reckless disregard to the truth and which were made with the intent that the Commission would substitute O'Connell's conclusion for its owns.  Such statement include statements to the effect that:

a.  The traffic and parking impact of the Parking Guys' valet operations servicing Deja Vu merited denial of the requested Valet Permit;

b.  There existed "inappropriate vehicular activity" at the intersection of 15th Avenue North caused by Parking Guys' valet operations servicing Deja Vu.

c.  That granting the requested Valet Permit would cause "unfortunate public safety concerns, traffic and parking issues that could affect performance of emergency vehicles, and general negative traffic and parking issues for area users of the public right of way."

67.     On August 14, 2017, the 'appeal' of the Parking Guy's request for a Valet Permit servicing Deja Vu was heard by the Commission (Attached as Exhibit 21 and hereby incorporated by reference as though fully set forth herein, is a true and accurate copy of is the Commission's August 14, 2017 agenda).

68.     Attached as Exhibit 22 and hereby incorporated by reference as though fully set forth herein, is a true and accurate copy of the Minutes of the Meeting of the Traffic and Parking Commission for August 14, 2017).

17

69.     The Minutes of the Meeting of the Traffic and Parking Commission for August 14,

2017 (Exhibit 22), demonstrate that there was and is no factual basis to deny the appeal.  The August

14, 2017 Minutes state in part:

> Collier Engineering presented that their findings . . . the operations of the
> valet service did not cause traffic concerns . . ."  ***BUT***, "Mr. Knauf
> commented that Council Member O'Connell has submitted a letter of
> support of the denial of the valet permit.

> (Emphasis added).

70.     Attached hereto as Exhibit 23 and hereby incorporated by reference as though fully

set forth herein, is a true and accurate transcript of the relevant portions of the Meeting of the Traffic

and Parking Commission for August 14, 2017.

71.     At the Commission's August 14, 2017 hearing, Diane Marshall of Metro Public

Works stated:

> Okay.  At last month's meeting you requested a study be done.  And Collier
> Engineering completed that study for us.  Amy with Collier is here.  She
> would like to discuss it. A copy of that information is on also with each –
> each of the commissioners.

> **Based on the observation that Collier Engineering did for us, they did
> not see direct problems with that valet operation.** But like I stated, Amy
> is here if there's anything you need to ask her, because she complete the
> study for us.

> (Emphasis added).

72.     At the Commissions August 14, 2017 hearing Metro Traffic Engineer Chip Knauf

explained:

> Basically the analysis that Amy found out – and – and let me say – preface
> this by saying maybe they knew they were being videotaped, I don't know.
> But the operations had typical valet concerns that you see in just about every
> valet operation in town where every once in a while they get overwhelmed
> with business and they have a few that are backed up in a queue, and then
> they – eventually it calms down and they go park them correctly.  That's
> what we found in the . . . one week of data.

73.     At the Commission's August 14, 2017 hearing, after the results of the empirical study were explained by Collier Engineering, Chairperson Marshall notes the letter by Commissioner O'Connell against the valet permit, which ostensibly garnered more attention than the Collier Report. "CHAIRPERSON GREEN:   All – is – everyone's clear about the councilmember's letter?  Okay.")

74.     The Commission's August 14, 2017 hearing then concluded with a  vote to deny the requested Valet Permit following comments from Commissioner Nora Kern:

> Well, I think the report and the pictures seem to be a little bit at odds from – just based on – on – kind of that – but I do think the letter from Councilman O'Connell should stand for a lot since he hopefully has a – the – a good feeling of what's going on on his street.  So I would move to deny the valet stand.

75.     In voting to deny The Parking Guys' requested permit, the Commission substituted the judgment of O'Connell, Schipani, and Molette for their own.

76.     The August 14, 2017 denial of The Parking Guys' requested permit to service Deja Vu is the operative denial for purposes of Metro Code Chapter 12.41.

77.     On September 7, 2017, The Parking Guys filed a petition for a writ of certiorari in Chancery Court (Case No. 17-970-II), which seeks review of the Commission's denial of the requested Valet permit. (Attached hereto as Exhibit 24 and hereby incorporated by reference as though fully set forth herein is a true and accurate copy of  the Petition for Writ of Certiorari with Exhibits;  Attached hereto as Exhibit 25 and hereby incorporated by reference as though fully set forth herein is a true and accurate copy of  the Writ of Certiorari).

78.     Attached hereto as Exhibit 26 and hereby incorporated by reference as though fully set forth herein is a true and accurate copy of the Amended Petition for Writ of Certiorari with exhibits).

19

## VI. 42 U.S.C. § 1985 CONSPIRACY TO DEPRIVE CIVIL RIGHTS:

79. The acts of Metro, O'Connell, Schipani, and Molette described above were part of single plan to orchestrate the improper denial of the Valet Permit requested by the Parking Guys to service Deja Vu.

80. Metro, O'Connell, Schipani, and Molette, in undertaking the acts described above, shared the general conspiratorial objective to orchestrate the improper denial of the Valet Permit requested by the Parking Guys to service Deja Vu.

81. As described above, Metro, O'Connell, Schipani, and Molette each undertook one or more overt acts in furtherance of orchestrating the improper denial of the Valet Permit requested by the Parking Guys to service Deja Vu, thereby causing a deprivation of Plaintiffs' Constitutional rights and other damages to Plaintiffs.

## VII. CAUSE OF ACTION – VIOLATION OF CIVIL RIGHTS CONTRARY TO 42 U.S.C. § 1983:

82. Plaintiffs allege that Metro and its officials violated Deja Vu's and Parking Guys' First and Fourteenth Amendment Civil Rights in violation of 42 U.S.C. § 1983 by:

   a. denying The Parking Guys' requested Valet Permit to service Deja Vu without due process of law, both procedural and substantive; and

   b. denying The Parking Guys' requested Valet Permit to service Deja Vu due to disagreement with or distain for Deja Vu's First Amendment protected speech and expression..

83. Metro's actions, described above, in denying The Parking Guys' requested Valet Permit to service Deja Vu, were taken in the course and scope of official duties and under the color of state law.

20

84.     As a direct and proximate cause of the unconstitutional actions of Metro, the Plaintiffs have incurred and suffered significant and substantial damages including, but not limited to loss of constitutional rights; lost business profits; loss of business reputation; and having to incur costs and attorney fees in seeking protection of their constitutional rights asserted herein.

## VIII.    PRAYER FOR RELIEF:

WHEREFORE, the Plaintiffs prays for the following relief:

A.      A declaration that the denial of The Parking Guys' requested Valet Permit to service Deja Vu was contrary to its rights under the First and Fourteenth Amendments to the United States Constitution.

B.      That, pursuant to 42 U.S.C. § 1983, Metro is liable to The Parking Guys and Deja Vu for the damages caused by the denial of The Parking Guys' requested Valet Permit to service Deja Vu.

C.      That, pursuant to 42 U.S.C. § 1985, Metro, O'Connell, Schipani, and Molette are jointly and severally liable for the damages caused by the denial of The Parking Guys' requested Valet Permit to service Deja Vu.

D.      An award of money damages in an amount to be determined by the jury.

E.      Punitive damages in amount to be determined by the jury;

F.      Attorney's fees and costs, appropriate to each claim;

G.      All equitable and general relief to which the Plaintiffs are entitled;

H.      Plaintiffs reserves the right to amend their prayer for relief based on discovery;

I.      That the appropriate causes of action be heard by a jury of six; and

J.      That the Plaintiffs be granted such other general relief as justice requires.

Respectfully Submitted,

*/s/ Bob Lynch, Jr.*
**Bob Lynch, Jr. (BPR# 6298)**
Washington Square, Suite 316
222 Second Avenue North
Nashville, TN 37201
615-255-2888 (Office)
Email: office@boblynchlaw.com
*Attorney for Plaintiff*

*/s/ Matthew J. Hoffer*
Matthew J. Hoffer (MI P70495)*
Shafer & Associates, P.C.
3800 Capital City Boulevard, Suite 2
Lansing, Michigan  48906
517-886-6560
Email: Matt@BradShaferLaw.com
*Attorney for Plaintiffs*
*\*pending admission pro hac vice*


## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully Submitted,

*/s/ Bob Lynch, Jr.*
**Bob Lynch, Jr. (BPR# 6298)**
Washington Square, Suite 316
222 Second Avenue North
Nashville, TN 37201
615-255-2888 (Office)
Email: office@boblynchlaw.com
*Attorney for Plaintiff*

*/s/ Matthew J. Hoffer*
Matthew J. Hoffer (MI P70495)*
Shafer & Associates, P.C.
3800 Capital City Boulevard, Suite 2
Lansing, Michigan  48906
517-886-6560
Email: Matt@BradShaferLaw.com
*Attorney for Plaintiffs*
*\*pending admission pro hac vice*

22