# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| DEJA VU OF NASHVILLE, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | NO. 3:18-cv-00511<br>CHIEF JUDGE CRENSHAW |
| METROPOLITAN GOVERNMENT OF NASHILLE AND DAVIDSON COUNTY, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Pending before the Court are Linda Schipani's Motion to Dismiss (Doc. No. 17) and

Motion to Strike (Doc. No. 36), in addition to Metropolitan Government of Nashville and

Davidson County ("Metro") and Freddie O'Connell's (collectively "Defendants") combined

Motion to Dismiss (Doc. No. 25).[1] Deja Vu of Nashville ("Deja Vu") and The Parking Guys

("TPG") (collectively "Plaintiffs") have filed responses to the instant motions (Doc. Nos. 26, 28,

---

[1] Lee Molette has filed a one-page "Joinder In Defendant Schipani's Motion to Dismiss And Memorandum In Support of Defendant Linda Schipani's Motion to Dismiss." (Doc. No. 23.) Molette states that his position is the same as Schipani, and, therefore, he "hereby joins Schipani's Motion to Dismiss, adopts all argument that Defendant Schipani made in the Schipani Motion to Dismiss, applies them herein, and respectfully requests the same relief articulated therein." (Id.) Nowhere in Molette's one-page "Joinder" does he identify the document as a "Motion for Joinder" or give any indication that he is a moving party. (Id.) Under Local Rule 7.01, any Court action that requires resolution of an issue of law must be performed pursuant to a party's motion and separate memorandum of law. Additionally, the Court's "Judicial Preferences" clearly states "[c]ounsel should <u>never</u> incorporate legal authority or factual argument from another document, including a prior brief or the brief of another party in the case." Judicial Preferences, Chief Judge Waverly D. Crenshaw, Jr., Middle District of Tennessee, https://www.tnmd.uscourts.gov/content/chief-district-judge-crenshaw (last visited Feb. 4, 2019) (emphasis added). Accordingly, Molette is required to file a separate Motion to Dismiss with an accompanying Memorandum of Law. To the extent that Molette's "Joinder" is a motion, it is **DENIED WITHOUT PREJUDICE.**

39), to which Defendants have replied (Doc. Nos. 27, 32). For the following reasons, Defendants' and Schipani's Motions to Dismiss (Doc. Nos. 17, 25) will be granted and Schipani's Motion to Strike (Doc. No. 36) will be denied as moot.

**I. <u>Factual Background</u>**

Deja Vu is a Nashville business engaged "in the presentation of female performance dance entertainment to the consenting adult public." (Doc. No. 1 at 2.) In early 2016, Deja Vu sold its original location at 1214 Demonbreun Street, Nashville, Tennessee to third-party developers and began relocation efforts. (<u>Id.</u> at 5-6.) In the summer of 2016, Deja Vu entered into a purchase agreement for a location at 1418 Church Street, Nashville, Tennessee, which was zoned for "adult use." (<u>Id.</u> at 6.) After Deja Vu purchased the property, Metro Council Members Freddie O'Connell and Bob Mendes introduced Ordinance No. BL2016-350 (the "Ordinance"), which sought to eliminate "adult entertainment" as a permissible land use for the zone where Deja Vu sought to operate its new establishment. (<u>See</u> Doc. No. 1-6.) O'Connell hoped that the Ordinance would trigger a larger conversation about adult entertainment in Nashville and would refocus these adult entertainment businesses away from downtown Nashville. (Doc. No. 1-7.) Ultimately, in October 2016, O'Connell publicly withdrew the Ordinance, and, in May 2017, Metro's Sexually Oriented Business License Board approved a license for the operation of Deja Vu's new club at 1418 Church Street. (<u>Id.</u> at 7.)

In June 2017, a local newspaper, The Tennessean, published an article entitled "New Deja Vu strip club on Church Street quickly draws complaints." (Doc. No. 1-10.) In the article, Lee Molette, a local developer who supported the Ordinance, commented that Deja Vu patrons were using drugs, dropping liquor bottles and other litter, and parking illegally on his and other nearby properties. (<u>Id.</u> at 1-2.) In the same article, O'Connell also stated that he had seen video footage of

a drug deal conducted near Deja Vu's new establishment. (Id. at 2.) Mike Durham, general manager and vice president of Deja Vu, disputed the allegations. (Id.) Finally, a spokesperson from Nashville Metro Police Department stated that additional patrols would be added to respond to the complaints. (Id.)

In conjunction with operating their new location, Deja Vu entered a written agreement with TPG to provide valet services for the club. (Doc. No. 1 at 8.) Deja Vu chose TPG in part because it was an established valet service business with no history of sanctions from the Metro Traffic and Parking Commission (the "Commission"). (Id.) Deja Vu alleges that a properly run valet service contributes to the orderly flow of traffic and is necessary to attract high-end patrons. (Id.) Accordingly, in May 2017, TPG filed its initial application to Metro's Public Works Department for permission to operate a valet service on 15th Avenue North to service Deja Vu. (Id. at 8-9.) Metro Public Works denied TPG's request, stating that parking was not allowed on Church Street or 14th Avenue. (Doc. No. 1-11.) Plaintiffs allege that a representative from Metro Public Works also orally informed them of the decision, and, when Plaintiffs asked for a reason supporting the decision, none was provided. (Doc. No. 1 at 9.)

On June 8, 2017, TPG timely appealed the Commission's valet application denial. (Id.) Metro Public Works then decided to hold a hearing on TPG's appeal. (Id.) Plaintiffs allege that, prior to and at the meeting, Schipani, who owns a building across from Deja Vu's new club, and Molette engaged in a plan to disseminate false information to obtain the permanent denial of TPG's valet application. (Id.) On June 9, 2017, Schipani sent an email to Diane Marshall, an employee of Metro Public Works, with Molette as a copied recipient, attaching a letter and stating "[a]nything that you can do to support the denial of this valet parking permit will be appreciated." (Doc. No. 1-14 at 1.) The attached letter was on behalf of the Midtown Church Street Business & Residential

Association and was addressed to Diane Marshall and Chip Knauf, a representative for the Commission. (Id. at 2.) The letter stated that, since Deja Vu opened and TPG operated its valet service (without a permit), its members had witnessed near miss accidents and traffic congestion, which necessitated a permanent denial of TPG's pending valet application. (Id.) Additionally, the letter stated that member businesses had been blocked out of their gated parking areas due to TPG's valet service and employees were having difficult maneuvering the street. (Id. at 3.) Plaintiffs allege that these statements were knowingly false when made and were communicated to obtain permanent denial of TPG's pending valet permit. (Doc. No. 1 at 10.)

On June 14, 2017, TPG began applying for, and receiving, a series of "Lane Closure Permits" for the operation of a valet service on 15th Street North while their valet permit appeal was pending. (Id.) On July 7, 2017, Schipani emailed Marshall and Molette a series of photographs, allegedly showing "consistent problems with valet parking on both sides of the street which impedes the flow of traffic, blocking private parking and presenting safety issues for drivers plus pedestrians." (Doc. No. 1-16 at 2.) Schipani, on behalf of the Midtown Church Street Business and Residential Association, "fervently ask[ed] [Marshall] to deny [TPG's] application." (Id.) TPG's valet application appeal was then placed on the Commission's agenda for its July 10, 2017 meeting. (Doc. No. 1 at 11.)

At the Commission's July 10 meeting, Molette first testified against TPG's valet permit appeal, stating that: (1) the street was too narrow for TPG's valet service; (2) TPG's current operation of the valet service was causing congestion; (3) TPG's current operation of the valet service was causing traffic to back up on 15th Street to Church Street; (4) the congestion caused by TPG's valet service was consistent day-to-day; and (5) a pedestrian was struck by a vehicle due to TPG's valet service. (Id. at 12.) Schipani also testified against TPG's valet appeal, noting that:

(1) TPG was parking vehicles on her property; (2) TPG was causing traffic "up and down" the street; and (3) TPG was "constantly" parking in a manner that impeded vehicular ingress and egress to her business's parking lot. (Id. at 12.) Diane Marshall testified that TPG's requested valet permit met the technical requirements of the Metro Code, explaining that a "No Parking to Corner" sign could be properly moved from 90 feet to 30 feet from the corner, thereby opening 60 feet for three 20-foot valet lanes and allowing TPG to legally operate the valet service for Deja Vu. (Id. at 13.) Finally, Chip Knauf, Traffic Engineer for Metro Public Works, reiterated that the requested valet permit met the technical code requirements for approval. (Id.) The Commission subsequently deferred the matter to their next meeting to gather additional evidence, including alleged video evidence showing the traffic congestion related to TPG's ongoing valet operation. (Id.)

Following the Commission's July 10, 2017 hearing, Metro retained Collier Engineering Company, Inc. ("Collier") to perform a study of TPG's ongoing valet operation and its effects on traffic. (Id.) Ultimately, Collier's report concluded that, during Deja Vu's busiest period (Friday night/Saturday morning) five vehicles experienced delay due to congestion at the valet stand. (Id. at 15.) On August 11, 2017, Schipani again emailed Knauf, Molette, and O'Connell, reiterating her position that TPG's valet appeal should be denied and stating that: (1) the neighborhood surrounding TPG's valet operation continued to witness public safety hazards attributable to TPG's valet service; (2) TPG's valet operation was associated with two pedestrians hit by cars in the past two months; and (3) the corner of Church Street and 15th Street was "gridlocked' most nights. (Id. at 16.) On August 14, 2017, O'Connell emailed Knauf requesting that TPG's valet appeal be denied and noting that:

> Area property owners have demonstrated . . . an extraordinary amount of inappropriate vehicular activity at the intersection in question . . . and I believe a valet here would present unfortunate public safety concerns, traffic and parking issues that could affect performance of emergency vehicles, and general negative traffic and parking issues for area users of the public right of way.

(Doc. No. 1-22. at 1.) Plaintiffs allege that O'Connell's email to Knauf was intended to be conveyed to the Commission and to influence the Commission to deny TPG's requested valet permit, and O'Connell "issued the email with the intent to use the color of his office as a Metro Council Member to influence the Commission to deny the appeal." (Doc. No. 1 at 17.)

On August 14, 2017, the Commission again took up TPG's appeal for a valet permit. (Id.) Collier presented their findings, Marshall reiterated that Collier found no direct problems with TPG's valet operation, and Knauf also noted that there were no outstanding problems with operating the valet in that area. (Id. at 18.) Ultimately, Commissioner Nora Kern stated:

> Well, I think the report and the pictures seem to be a little bit at odds from—just based on—but I do think the letter from Councilman O'Connell should stand for a lot since he hopefully has a good feeling of what's going on his street. So I would move to deny the valet stand.

(Id. at 19.) The Commission then denied TPG's valet application appeal. (Id.) Plaintiffs allege that, in voting to deny the appeal, the Commission substituted the judgment of O'Connell, Schipani, and Molette for their own. (Id.) Plaintiffs filed a petition for a writ of certiorari in Davidson County Chancery Court, seeking a review of the Commission's decision. (See Doc. No. 1-26.) The Davidson County Chancery Court ultimately denied Plaintiffs' petition, subject to Plaintiffs' currently pending appeal. (Doc. No. 26-2 at 1-2.)

Plaintiffs allege that "the acts of Metro, O'Connell, Schipani, and Molette were part of a single plan to orchestrate the improper denial of the valet permit requested by TPG to service Deja Vu" in violation of 42 U.S.C. § 1985. (Doc. No. 1 at 20.) Further, Plaintiffs allege that Metro and its officials violated Deja Vu and TPG's First and Fourteenth Amendment rights, contrary to 42

U.S.C. § 1983, by (1) denying TPG's requested valet permit without substantive and procedural due process of law; and (2) denying TPG's requested valet permit due to disagreement with or disdain for Deja Vu's First Amendment protected speech and expression. (Id.) Plaintiffs request monetary damages, attorney's fees and costs, and all equitable and general relief to which they are entitled. (Id. at 21.)

## II. __Schipani's Motion to Dismiss__

Schipani has filed a Motion to Dismiss (Doc. No. 17), pursuant Federal Rules of Civil Procedure 12(b)(1), 12(b)(5) and 12(b)(6), to dismiss Plaintiffs' § 1985 claim against her. First, Schipani argues that the Court should decline to exercise subject matter jurisdiction over Plaintiffs' claim pursuant to __Colorado River Water Conservation District v. United States__, 424 U.S. 800 (1976) and __Burford v. Sun Oil Co.__, 319 U.S. 315 (1943). (Doc. No. 18 at 7-14.) Schipani also argues that Deja Vu's § 1985 claim must be dismissed for lack of standing because Deja Vu has not suffered a cognizable injury. (Id. at 16.)

Regarding the merits, Schipani first contends that she is absolutely immune from Plaintiffs' lawsuit because her statements were made while she was a witness in quasi-judicial and administrative proceedings. (Id. at 4-7.) Further, she argues that Plaintiffs have failed to state a claim under § 1985 because they have not alleged any class-based, invidiously discriminatory animus. (Id. at 14-15.) She also contends that she did not produce, and could not have produced, the alleged injury. (Id. at 15-24.) Finally, she argues that Plaintiffs' action should be dismissed for improper service of process. (Id. at 24-26.)

A. __Abstention and Standing__

Schipani contends that, pursuant to __Colorado River__, the instant federal suit and Plaintiffs' still-pending Davidson County Chancery Court action are parallel because both lawsuits are

presently pending, the claims in each action are predicated upon the same allegations and same material facts, the alleged injuries arise out of the same administrative decision, and all the parties to the Davidson County Chancery Court action are parties to the instant case. (Id. at 9.) Further, she argues that all eight of the <u>Colorado River</u> factors favor abstention. (Id. at 9-13.) Alternatively, she asserts that abstention is appropriate under <u>Burford</u> because review of the Commission's proceeding is available under state law (and is currently ongoing in Davidson County Chancery Court) and the exercise of federal review would interfere with state-level efforts to establish coherent policies on a matter of public concern, namely traffic flow on public streets. (Id. at 13-14.) Finally, Schipani maintains that, to the extent Deja Vu asserts a § 1985 claim against her, it must be dismissed for lack of standing because Deja Vu itself has not suffered any cognizable injury. (Id. at 17.) Schipani concludes that (1) TPG was the only entity whose permit application was considered and ultimately rejected by the Commission; and (2) TPG's inability to obtain a valet permit has no bearing on Deja Vu's right or ability to operate, and it is also free to have valet services provided by another entity. (Id. at 13-18.)

In response, Plaintiffs argue that it would not be appropriate for the Court to abstain. Plaintiffs contend that the instant federal suit is of a completely different character than the state action, with different requested relief, such that the suits are not parallel under <u>Colorado River</u>. (Doc. No. 26 at 16.) Plaintiffs also argue that the instant case does not involve the type of complex administrative issues <u>Burford</u> abstention is designed to address. (Id. at 19.) Finally, Deja Vu counters that it has standing because it has been denied a government entitlement due to its protected First Amendment activity. (Id. at 22.) The Court will consider Schipani's abstention arguments first and then turn to her standing argument.

Pursuant to the Supreme Court's holding in Colorado River, "a federal court may, in certain limited circumstances, decline to adjudicate a claim that is already the subject of a pending state-court case." RSM Richter, Inc. v. Behr Am., Inc., 729 F.3d 553, 556 (6th Cir. 2013). A court called upon to consider Colorado River abstention must engage in a two-step process: first, the Court must determine if the State and federal proceedings are "actually parallel" to one another; and then, only if the threshold requirement of parallelism is met, the Court will engage in a multi-factor balancing analysis to decide whether to abstain. Romine v. Compuserve Corp., 160 F.3d 337, 339–41 (6th Cir. 1998). Underlying this analysis is the fundamental principle that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) (citing Colorado River, 424 U.S. at 821). Accordingly, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." Colorado River, 424 U.S. at 813. Because abstention is an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it," the Court will only abstain in cases presenting "the clearest of justifications" for doing so. Rouse v. DaimlerChrysler Corp., 300 F.3d 711, 715 (6th Cir. 2002).

Considering the high standard required to justify abstention, the Court concludes that Plaintiffs' case, as it currently exists, is not sufficiently parallel to justify this Court's inaction under Colorado River. "For the cases to be considered parallel, 'substantially the same parties must be contemporaneously litigating substantially the same issues,' and 'the critical question is whether there is a substantial likelihood that the state litigation will dispose of *all* claims presented in the federal case.'" Summit Contracting Grp., Inc. v. Ashland Heights, LP, No. 3:16-CV-17, 2016 WL 2607056, at *3 (M.D. Tenn. May 6, 2016) (quoting Capitol Wholesale Fence Co. v. Lumber One

Wood Preserving, LLC, No. 3:13-cv-00521, 2014 WL 7336236, at *3 (M.D. Tenn. Dec. 22, 2014) (emphasis added)).

Schipani has not demonstrated that the Davidson County Chancery Court appeal is substantially likely to dispose of the instant § 1985 claim arising out of the Commission's denial of TPG's valet permit application. First, the claims (and associated issues) in each action are distinct. TPG's petition for writ of certiorari seeks to determine whether the Commission's decision was supported by material and competent evidence, while the instant federal suit seeks to determine whether Defendants acted conspiratorially, in violation of § 1985, to damage Plaintiffs' respective businesses. Moreover, the requested relief also distinguishes the actions, with TPG's petition for writ of certiorari seeking to reverse the Commission's denial and the instant federal suit seeking monetary damages stemming from that denial. Put simply, the instant federal action and the Davidson Chancery Court action are not sufficiently parallel to require abstention under Colorado River. Given the significant differences in the state and federal actions, there is no "clear justification" warranting abstention, and, therefore, the Court will exercise its jurisdiction over this matter. See Rouse, 300 F.3d at 715 (requiring the "clearest of justifications" to warrant abstention).

In contrast to Colorado River abstention, Burford abstention "is concerned with protecting complex state administrative processes from undue federal interference," but "it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." New Orleans Pub. Serv., Inc., v. Council of New Orleans, 491 U.S. 350, 362 (1989). Rather, "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case

10

then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" Id.

The Court agrees with Plaintiffs that, here, abstention based on Burford would not be appropriate. Plaintiffs' instant action does not directly challenge the Commission's valet permit denial, but, rather, asserts that: (1) the individual defendants (Schipani, Molette, and O'Connell) conspired to prevent Plaintiffs from obtaining the permit in violation of § 1985; and (2) Metro violated Plaintiffs' rights in violation of § 1983. (See Doc. No. 1 at 20-21.) Although Plaintiffs' instant federal suit necessarily takes issue with the Commission's ultimate decision, whether that decision was justified is not the relevant question in this case. Further, the Court doubts that its review of the case will be substantially disruptive to Nashville and Davidson County's efforts to establish coherent traffic and permitting policy. Accordingly, the Court will not abstain in this matter under Burford.

Next, the Court turns to Schipani's standing argument. The Article III standing doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong. Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016). Standing is the threshold question in every federal case. Warth v. Seldin, 422 U.S. 490, 498 (1975). In order to establish Article III standing, the plaintiff must have (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendants; and (3) that is likely to be redressed by a favorable judicial decision. Spokeo, 136 S.Ct. at 1548. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990). Where, as here, a case is at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element of standing. Warth, 422 U.S. at 518.

To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). For an injury to be particularized, it must affect the plaintiff in a distinct way. Whitmore v. Arkansas, 495 U.S. 149, 155 (1990). A concrete injury must be "de facto," in other words, it must actually exist. Spokeo, 136 S. Ct. at 1548.

Schipani argues that Deja Vu cannot establish a cognizable injury because it was TPG, not Deja Vu, who was denied the valet permit. (Doc. No. 18 at 17.) Accordingly, Deja Vu's claim that Defendants' First Amendment animus motivated the denial is irrelevant because it can continue to conduct its constitutionally protected "dance entertainment" business without a valet service or contract with another valet service and attempt to obtain another permit. (Id.)

Although inartfully argued, it appears that Deja Vu's alleged injury in fact is that (1) the Commission's denial of TPG's valet application, with whom it specifically contracted, prevented it from servicing certain clientele; (2) the denial of this alleged benefit was due to its protected First Amendment activity; and, therefore (3) its First Amendment rights have been violated. See Perry v. Sindermann, 408 U.S. 593, 597 (1972) (holding that the government may not deny a benefit to a person on a basis that infringes on his constitutionally protected freedom of speech even if the person has no right to that benefit). Based on Plaintiffs' allegations in the complaint, the Court finds that Deja Vu has alleged a violation of its constitutional rights sufficient to constitute an injury in fact.[2] Further, as part of their § 1985 claim, Plaintiffs challenge Schipani's

---

[2] Additionally, Schipani's conclusory assertion that Deja Vu can merely contract with another valet service is belied by the factual record. Schipani's (and Molette's) multiple and fervent complaints to the Commission about TPG's valet service were premised on the congestion the service created and the logistical impossibility of any valet service, not just TPG, servicing Deja Vu. (See Doc. Nos. 1 at 16, 1-16 at 2.) Schipani gives no indication that these same

communications and testimony before the Commission and argue that those communications furthered the alleged conspiracy between Schipani, Molette, and O'Connell. Accordingly, the identified conduct is fairly traceable to Schipani. <u>Sopkeo</u>, 136 S.Ct at 1548. Finally, the alleged conspiracy is likely to be redressed by a favorable judicial decision, in the form of monetary damages and declaratory relief, and, therefore, Deja Vu has standing to assert its § 1985 claim against Schipani. <u>See</u> <u>id.</u>

     B.  <u>42 U.S.C. § 1985</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Schipani argues that Plaintiffs' § 1985 claim (the only claim asserted against her) must be dismissed because Plaintiffs have failed to allege any class-based, invidious discriminatory animus. (Doc. No. 18 at 14.) Schipani notes that § 1985 claims are required to contain allegations of class-based invidiously discriminatory animus, and the class must be based upon race or other inherent personal characteristics. (<u>Id.</u> at 15.) Schipani asserts that the complaint does not allege any class-based invidiously discriminatory animus, and this failure necessitates dismissal as a matter of law. (<u>Id.</u>) In response, Plaintiffs acknowledge that they have not alleged class-based invidiously discriminatory animus but argue that such an allegation is not necessary. The Court disagrees.

Section 1985(3) provides that:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

---

complaints could not, or would not, be raised against other potential valet service vendors. Indeed, the suggestion that the individual defendants would not object to another valet service strains credulity.

42 U.S.C. § 1985(3).

The elements of such a claim are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Vakilian v. Shaw, 335 F.3d 509, 518 (6th Cir. 2003) (citing United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828–29 (1983)). Further, because Section 1985(3) provides a federal cause of action against persons who conspire to deprive an individual of "equal protection of the laws" or of "equal privileges and immunities under the laws," the Sixth Circuit has repeatedly held that a plaintiff must also "allege that the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." Moniz v. Cox, 512 Fed. Appx. 495, 499–500 (6th Cir. 2013) (collecting cases). Thus, "[t]o sustain a claim under section 1985(3), a claimant must prove both membership in a protected class and discrimination on account of it." Smithers ex rel. Norris v. City of Flint, 602 F.3d 758, 765 (6th Cir. 2010).

Plaintiffs do not claim racial animus or membership in a protected class as a basis for their § 1985 claim. Rather, they rely on Scott for the contention that "a conspiracy to violate First Amendment rights is actionable where the plaintiff alleges governmental involvement or an aim to influence state actions." (Doc. No. 26 at 21.) In Scott, the Supreme Court quoted Griffin v. Breckenridge, 403 U.S. 88, 91 (1971), for the principle that a claim under § 1985(3) could only be "motivated by some racial or perhaps otherwise class-based invidiously discriminatory animus behind the conspiracy." Griffin, 403 U.S. at 91 (emphasis added). However, the Supreme Court observed that "we have not yet had occasion to resolve the 'perhaps'; only in Griffin itself have

we addressed and upheld a claim under § 1985(3), and that case involved race discrimination."

Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 269 (1993). The Court also provided:

> Whatever may be the precise meaning of a "class" for purposes of Griffin's speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid.

Id.

The complaint contains not a single allegation about a group of individuals that share their desire to engage in the same First Amendment activity opposed by Defendants, let alone that the amorphous group was subjected to racially discriminatory animus because of their desire. Indeed, Plaintiffs have not even alleged "entitle[ment] to the kind of special protection" afforded by § 1985(3) required for such a class. Royal Oak Entm't, LLC v. City of Royal Oak, 205 F. App'x. 389, 399 (6th Cir. 2006); see McGee v. Schoolcraft Cmty. Coll., 167 F. App'x. 429, 435 (6th Cir. 2006) (citation omitted) ("The Sixth Circuit has ruled that § 1985(3) only applies to discrimination based on race or membership in a class which is one of those so-called 'discrete and insular' minorities that receive special protection under the Equal Protection Clause because of inherent personal characteristics."). Accordingly, Plaintiffs' § 1985(3) claim against Schipani will be dismissed.[3]

---

[3] Because the Court dismisses Plaintiffs' § 1985 claim on this basis and does not reach the witness immunity issue, Schipani is not entitled to attorneys' fees under Tennessee Code Ann. § 4-21-1003(c).

## II. **Metro and O'Connell's Combined Motion to Dismiss**

Metro and O'Connell have filed a combined Motion to Dismiss. (Doc. No. 25.) First, as to Plaintiffs' 42 U.S.C. § 1983 claim, Metro, argues that: (1) there can be no substantive due process violation where there is no constitutionally-protected property interest at stake (such as the discretionary benefit at issue here in the form of a valet location permit); and (2) Plaintiffs fail to state a procedural due process violation because they have not alleged how or why the state-level proceedings are not adequate to address their concerns. (Id. at 1-5.) Further, to the extent that Plaintiffs assert a First Amendment retaliation claim, Metro argues that such a claim must fail because there has been no adverse action taken against Deja Vu, and, alternatively, there are no facts alleged that would show that the permit denial was motivated by animus against Deja Vu's offering of adult-entertainment. (Id. at 5-7.) Third, Metro contends that Plaintiffs' § 1985 claim against it should be dismissed because (as stated by Schipani above) there are no allegations that the alleged discrimination was based on race or membership in some other protected class defined by inherent personal characteristics. (Id. at 7-8.) Finally, O'Connell contends that Plaintiffs' § 1985 claim against him should be dismissed based on his legislative immunity. (Id. at 8-9.)

### A. 42 U.S.C. § 1983 Claim Against Metro

Metro has moved to dismiss Plaintiffs' § 1983 claim for lack of a constitutionally-protected property interest at stake, failure to allege inadequacy of state court remedies, and failure to allege First Amendment animus. (Doc. No. 25 at 2-7.) In response, Plaintiffs argue that: (1) they had a legitimate expectation in the issuance of a valet permit based on the language of the Metro Code; (2) the state court remedy is inadequate because it does not provide for money damages; and (3) the reason for the denial was due to improper animus towards Deja Vu's First Amendment activity. (Doc. No. 28 at 9-16.)

Title 42 U.S.C. § 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws . . ." To state a claim under § 1983, a plaintiff must allege and show two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of state law. Tahfs v. Proctor, 316 F.3d 584, 590 (6th Cir. 2003); 42 U.S.C. § 1983.

Moreover, to bring a substantive due process claim, a plaintiff must possess a constitutionally-protected property or liberty interest. Silver v. Franklin Twp. BZA, 966 F.2d 1031, 1036 (6th Cir. 1992) ("To establish a violation of substantive due process, a plaintiff must first establish the existence of a constitutionally-protected property or liberty interest.") "Whether a person has a 'property' interest is traditionally a question of state law." EJS Props., LLC v. City of Toledo, 698 F.3d 845, 855 (6th Cir. 2012) (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982)). "However, 'federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause.'" Id. (quoting Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 757 (2005) (emphasis in original)). A party cannot have a property interest in a discretionary benefit. EJS Props., 698 F.3d at 857. The Sixth Circuit has "recognized that a party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." Id. (citing cases).

Accordingly, before Plaintiffs can establish a violation of substantive due process, they must demonstrate that they had a property interest in the valet permit. See Silver, 966 F.2d at 1036. To do this, they must demonstrate that the Commission did not have the discretion to deny TPG's valet permit if it complied with certain minimum, mandatory requirements. Id. If the Commission

had the discretion to deny TPG's valet permit, even if it complied with certain minimum, mandatory requirements, then Plaintiffs would not have a "legitimate claim of entitlement" or a "justifiable expectation" in the approval of the valet permit. See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); see also Board of Regents v. Roth, 408 U.S. 564, 577 (1972).

Accordingly, the Court must examine the Metro Code to determine if the Commission had the discretion to deny TPG's valet permit. Section 12.41.030 of the Metro Government of Nashville and Davidson County Code of Ordinances provides that:

> In addition to the licensing requirements of Section 12.41.020 of this chapter, the department shall issue parking permits to valet parking operators to conduct their operations on public streets as a commercial enterprise or in furtherance of a commercial enterprise. A separate permit is required for each location where valet parking services are provided. Permits will be issued only for locations where valet parking would not be detrimental to the public safety, health and welfare of the inhabitants of Nashville and Davidson County and only after approval of the commission.

Section 12.41.030 clearly directs the Commission to issue permits "only for locations where valet parking would not be detrimental to the public safety, health, and welfare of the inhabitants of Nashville and Davidson County." Id.

The Court concludes that Section 12.41.030, specifically the "public safety, health, and welfare" language gives the Commission broad discretion to deny valet permits even if the applicant can otherwise demonstrate that its permit application meets the Metro Code's technical requirements for issuance. See Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 679 (3d Cir. 1991), abrogated on other grounds by United Artists Theatre Cir., Inc. v. Tws. of Warrington, PA, 316 F.3d 392 (3d Cir. 2003) (finding plaintiffs did not have a cognizable property interest in receiving a potential license to operate a dance hall where statute prohibited issuance of licenses pending review to determine that "the facility complies with 'all laws, ordinances, health and fire regulations, applicable thereto, and is a safe and proper place for the purpose for which it

shall be used;'" and concluding that the implicit discretion in the "safe and proper place" language precluded legitimate claim of entitlement to issuance of the license). Because the Commission has such broad discretion, Plaintiffs possessed neither a legitimate claim of entitlement to the valet permit, nor a justifiable expectation that the Commission would issue the permit. Plaintiffs, therefore, possessed no property interest that could support a substantive due process claim. Accordingly, Plaintiffs substantive due process claim must be dismissed.

For this same reason, Plaintiffs' procedural due process claim must be dismissed. See ESJ Props., 651 F. Supp. 2d at 755-56 ("Because the City possessed this discretion, EJS has no property interest, and its procedural due process claim against defendants fails as a matter of law."); Marvin v. City of Taylor, 509 F.3d 234, 244 (6th Cir. 2007) ("If there is no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law.") Finally, as to Plaintiffs' First Amendment argument that they were denied a governmental benefit due to the exercise of their protected, fundamental First Amendment rights (Doc. No. 28 at 13), such argument is beside the point absent a constitutionally-protected property interest. See R.S.W.W. v. City of Keego Harbor, 397 F.3d 427, 435-37 (6th Cir. 2005) (reaching plaintiff's First Amendment argument only after concluding it had a constitutionally protected property interest in a government benefit). Plaintiffs' § 1983 claim against Metro will therefore be dismissed in its entirety.

B.  Section 1985 Claim Against Metro and O'Connell

Plaintiffs allege that Metro and O'Connell were part of a single plan to orchestrate the improper denial of the valet permit requested by TPG to service Deja Vu. (Doc. No. 1 at 20.) As noted, because Section 1985(3) provides a federal cause of action against persons who conspire to deprive an individual of "equal protection of the laws" or of "equal privileges and immunities under the laws," the Sixth Circuit has repeatedly held that a plaintiff must also "allege that the

conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." Moniz, 512 Fed. Appx. at 499–500. Plaintiffs have failed to allege any class-based, discriminatory animus, and, therefore, as with the § 1985 claim against Schipani, Plaintiffs' § 1985 claim against Metro and O'Connell will also be dismissed. Because the Court will dismiss the Plaintiffs' claim on this basis, the Court does not consider O'Connell's legislative immunity argument.

## IV. **Plaintiffs' Requests for Leave to Amend**

In both of its responses to Defendants' Motions to Dismiss, Plaintiffs request leave to amend their complaint in lieu of dismissal. (Doc. Nos. 26 at 25, 28 at 18.) In her reply, Schipani argues that leave to amend should not be granted because amendment would be futile. (Doc. No. 27 at 5.) Metro and O'Connell make no argument regarding leave to amend. (See Doc. No. 32.)

First, the Court notes that Plaintiffs' ability to amend the complaint as a matter of course has long since passed. See Fed. R. Civ. P. 15(a)(1). Accordingly, Plaintiffs seek amendment in lieu of dismissal under Federal Rule of Civil Procedure 15(a)(2), which provides that a party may amend its pleading only with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." Id. When a motion to dismiss is granted, the usual practice is to grant plaintiffs leave to amend the complaint. See PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 699-700 (6th Cir. 2004), abrogated on other grounds by Doshi v. Gen. Cable Corp., 823 F.3d 1032 (6th Cir. 2004); Fed. R .Civ. P. 15(a). However, while Rule 15 plainly embodies a liberal amendment policy, a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a). See PR Diamonds, 364 F. 3d at 699 (quoting Confederal Mem'l Ass'n v. Hines, 995 F.2d 295, 299 (D.C. Cir. 1993)). "What plaintiffs may have stated, almost as an aside to the district court in a memorandum in

opposition to the defendant's motion to dismiss is also not a motion to amend." Begala v. PNC Bank, Ohio, N.A., 214 F.3d 776, 784 (6th Cir. 2000). The Sixth Circuit went on to explain that:

> Had plaintiffs filed a motion to amend the complaint prior to th[e] Court's consideration of the motions to dismiss and accompanied that motion with a memorandum identifying the proposed amendments, the Court would have considered the motions to dismiss in light of the proposed amendments to the complaint . . . Absent such a motion, however, Defendant was entitled to a review of the complaint as filed pursuant to Rule 12(b)(6). Plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies.

Id. (emphasis in original)

Here, Plaintiffs have made the exact bare request the Sixth Circuit so disfavored in PR Diamonds and Begala. (See Doc. Nos. 26 at 25, 28 at 18.) Accordingly, Plaintiffs are not entitled to amend after an advisory opinion from the Court identifying the relevant defects in the complaint. See Begala, 214 F.3d at 784. Therefore, Plaintiffs requests for leave to amend in lieu of dismissal are denied. Defendants are entitled to review of their motions and the complaint as filed. Id.

**V. Conclusion**

For these reasons, Schipani's Motion to Dismiss will be granted. Metro and O'Connell's Motion to Dismiss will be granted. Based on the dismissal of Plaintiffs' § 1985 claim against Schipani, her Motion to Strike will be denied as moot.

An appropriate Order will follow.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE